UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

IRWIN J. BARKAN and
D&D BARKAN LLC,

      Plaintiffs,

v.                        C.A. No. 05-050L

DUNKIN' DONUTS, INC. and
BASKIN-ROBBINS USA, CO.,

      Defendants.

## MEMORANDUM AND ORDER

Ronald R. Lagueux, Senior District Judge.

This matter is before the Court on two motions filed by Defendants Dunkin' Donuts, Inc., and Baskin-Robbins USA, Co. ("Defendants"): a motion to dismiss Counts III, IV and V of Plaintiffs' First Amended Verified Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6); and a motion to strike Plaintiffs' jury demand and multiple damages demand, pursuant to Federal Rule of Civil Procedure 12(f).  For the reasons detailed below, the Court denies Defendants' motion to dismiss Count III, grants the motion to dismiss Counts IV and V, and denies Defendants' motion to strike the jury demand.

### Standard of Review

Defendants move to dismiss the claims against them pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for

failure to state a claim upon which relief may be granted.   In considering a Rule 12(b)(6) motion, a court must accept as true all allegations in the complaint and draw all reasonable inferences in the plaintiff's favor.   Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996).   The United States Supreme Court, in recently abrogating the frequently-cited Conley v. Gibson, 355 U.S. 41 (1957), restated the standard as follows: "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1969 (2007).

Ordinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment. Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001).   Courts, however, make an exception "for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993).   When a complaint's factual allegations are linked to and dependent upon a document whose authenticity is not challenged, such a document "merges into the pleadings" and the court may properly consider it under a Rule 12(b)(6) motion to dismiss. Alternative Energy, 267 F.3d at 33 (quoting Beddall v. State St.

-2-

Bank & Trust Co., 137 F.3d 12, 17 (1st Cir. 1998)).

"[T]he problem that arises when a court reviews statements extraneous to a complaint generally is the lack of notice to the plaintiff . . . . Where plaintiff has actual notice . . . and has relied upon these documents in framing the complaint[,] the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated." Cortec Indus. Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991).

In this case, Plaintiffs refer to franchise agreements between Defendants and corporate entities owned by Barkan (which are not parties in this case), as well as to Store Development Agreements ("SDAs") between Plaintiffs and Defendants.  Neither the SDAs nor the franchise agreements are attached as exhibits to the First Amended Verified Complaint ("Complaint").  While the heart of Plaintiffs' Complaint is a breach of contract case based on allegations that the Defendants breached the Settlement Agreement, which is attached to the Complaint, Plaintiffs nonetheless refer to the SDAs in Count I and Count II of the Complaint.[1]  Indeed, the dollar amount at which Plaintiffs value the SDAs appears to comprise their damages claim in its entirety. Defendants attach copies of the SDAs to their Motion to Dismiss. Because Plaintiffs' factual allegations are linked to these

---

[1] Plaintiffs' Count I is for fraud.  Count II alleges that Defendants breached the express terms of the Settlement Agreement.  Defendants did not move to dismiss these counts.

-3-

contracts and their authenticity is not disputed, this Court has considered these documents without converting the Motion to Dismiss into a motion for summary judgment.

### Facts

Accepting as true all of Plaintiffs' allegations, the Court summarizes the facts alleged in Plaintiffs' Complaint. Plaintiff Irwin Barkan ("Barkan") is the owner of Plaintiff D&D Barkan LLC ("D&D"), a Rhode Island limited liability company (collectively, "Plaintiffs"). In 2002 and 2003, five separate legal entities wholly-owned by Barkan ("the Barkan corporate entities") each entered into a franchise agreement with Defendants for the operation of five existing Dunkin' Donuts shops in Providence, Rhode Island. In May 2002, D&D entered into a Store Development Agreement ("SDA") with Defendants for the development of an additional Dunkin' Donuts shop in Providence ("Providence SDA"). (Defs.' Mot. Dismiss Jeffrey S. Brenner Declaration Ex. A.) In 2003, Barkan entered into three additional SDAs with Defendants for the development of additional shops in East Greenwich, Rhode Island ("East Greenwich SDA"), Burrillville, Rhode Island ("Burrillville SDA"), and Cranston, Rhode Island ("Cranston SDA"). (Id. Exs. B, C, D.)

Each of the SDAs required "the Developer" (D&D in the Providence SDA, and Barkan in the remaining SDAs), within a

-4-

limited time frame, to construct and open a specified number of Dunkin' Donuts shops, the "Specified Unit" referred to in the agreements. (Id. Exs. A-D, ¶ 1A.)  The contracts also included several restrictions on Plaintiffs' ability to sell or otherwise transfer their development rights under the SDAs, including that, prior to any transfer, "Developer must have opened at least one Specified Unit covered by this Agreement."  (Id. Exs. A-D, ¶ 13B.)  These SDAs also contain jury waiver provisions and limitations on damages provisions that foreclose the possibility of any claim for punitive, multiple and/or exemplary damages. (Id. Exs. A-D, ¶ 18F.)

In 2004, Barkan opened a Dunkin' Donuts shop in Burrillville (pursuant to the Burrillville SDA) and in Warwick, Rhode Island, (pursuant to the East Greenwich SDA), but no shops were developed pursuant to the Providence or Cranston SDAs.

Financing for the franchise agreements and the SDAs was provided by CIT, a lender associated with Defendants.  Defendants introduced Plaintiffs to CIT, helped arrange the loan for Plaintiffs, and guaranteed it.  In 2003, Plaintiffs sought to restructure their debt to CIT and resolve disputes with Defendants.  After several proposals were rejected by Defendants, on June 15, 2004, Defendants and Plaintiffs entered into a Settlement Agreement.  (Exhibit 1 to Complaint).

In the Settlement Agreement, Defendants agreed to help

Plaintiffs refinance their debt with CIT and to amend the SDAs, primarily by adjusting the dates certain obligations were due. In exchange, Plaintiffs agreed to grant a release of any claims against Defendants and to remain current on all obligations under the Settlement Agreement, the franchise agreements and leases, and other agreements entered into with third parties in connection with the franchises. Defendants' commitment to aid in the refinancing of the CIT debt is carefully worded:

> FRANCHISOR [Defendants and Third Dunkin' Donuts Realty, Inc.] hereby agrees to work with FRANCHISEES [Plaintiffs and the Barkan corporate entities] and CIT to attempt to re-finance such existing debt. Specifically, FRANCHISOR will request that CIT issue a new note for the current balance of the financing, including interest and cure payments . . . . In addition to all documents required by the CIT group, such refinancing shall be secured by one or more security agreements . . . . FRANCHISOR makes no representation that CIT will provide such financing.

(Exhibit 1 to Complaint, pp. 4-5). Plaintiffs allege that the promise to help them refinance the CIT debt was a material inducement for them to enter into the Settlement Agreement with Defendants. Based on conversations with Defendants, Plaintiffs believed that there would be no problem in refinancing the debt because of CIT's longstanding relationship with Defendants, and because Defendants were the guarantors of the debt.

As a condition for the refinancing with CIT, Plaintiffs were required to make a payment to CIT of $11,561.83 on the existing loan, and to pay a fee of $7,000 for re-writing the debt.   In

addition, Defendants were to sign recourse letters, and CIT was
to amend the debt agreements.  After the execution of the
Settlement Agreement, Plaintiffs paid approximately $13,000 to
CIT on the existing loan, including interest.  However, they
planned to defer payment of the $7,000 fee until CIT amended the
debt agreement.

In July 2004, Plaintiffs were informed by Defendants that
CIT would not refinance the debt.  An employee of CIT later
revealed to Plaintiffs that the refinancing did not go through
because Defendants did not request the refinancing from CIT, nor
did Defendants provide CIT with the necessary paperwork on time.

During the same time period, Plaintiffs sought to resolve
their financial difficulties by finding a buyer for their Dunkin'
Donuts shops, franchise agreements and related assets.
Plaintiffs regularly communicated to Defendants the content of
negotiations for the sale of the assets.  On January 13, 2005,
Defendants met with one potential purchaser, but did not invite
Plaintiffs to the meeting.  Soon after, this potential purchaser
requested a reduction in the purchase price and other concessions
that led Plaintiffs to reject his offer.

Another offer was then tendered by a potential buyer who was
an "A" rated Dunkin' Donuts franchisee (an "A" rating is the
highest available rating).  This offer provided for payment of
all amounts owed by Plaintiffs to Defendants at the time of sale,

an inducement not included in the first offer.  This second offer was an improvement on the first offer also because it required no rent concessions from franchisor, Third Dunkin' Donuts Realty, Inc.

Plaintiffs allege that Defendants purposefully derailed negotiations with the second potential purchaser by warning the purchaser that if it went through with the deal to acquire the Barkan franchises, its existing network of Dunkin' Donuts stores would be re-rated to "B," which would prevent further expansion.

Next, in a letter dated January 31, 2005, Defendants notified Plaintiffs that they were in default of the Settlement Agreement and that they had seven days to cure the default with a payment of $1,374,122.40.  A failure to cure, Defendants wrote, would result in the termination of the franchise agreements.

Plaintiffs requested three additional days in order to secure a signed purchase and sale agreement from the second purchaser, but Defendants denied the request.  Plaintiffs did indeed come to an agreement with the second purchaser, but not before the cure deadline.

On February 8, 2005, Plaintiffs filed the original Complaint in this case, requesting a temporary restraining order to maintain the status quo and constrain Defendants from terminating the franchise agreements.  This Court granted the temporary restraining order on that date and scheduled a hearing for

February 14, 2005.  At the hearing, the Court was informed that
the Barkan corporate entities (not including Plaintiffs Barkan
and D&D) had filed for Chapter 11 bankruptcy protection.  The
Court vacated the Temporary Restraining Order, denied Plaintiffs'
request for a preliminary injunction and stayed the matter.

On December 28, 2005, Defendants filed a Motion to Dismiss
the Barkan corporate entities from the original Complaint.  This
Court granted that Motion with prejudice on January 31, 2006.
Plaintiffs filed the First Amended Verified Complaint and Demand
for Jury Trial on August 18, 2006.  Defendants filed the present
Motion to Dismiss and Motion to Strike on October 23, 2006, to
which Plaintiffs objected on November 10, 2006.  All briefs have
been filed and the motions are now in order for decision.

## Analysis of Motion to Dismiss

### Count III - Breach of Covenant of Good Faith and Fair Dealing

In the Complaint, Plaintiffs allege that the Settlement
Agreement contains an implied promise that all parties will deal
fairly, in good faith, in carrying out its terms.  It is further
alleged that by refusing to approve Plaintiffs' sale of the
businesses and then exercising their discretionary right to
terminate the franchise agreements, Defendants acted in bad
faith, with an improper motive.  In response to this allegation,
Defendants make several arguments.

-9-

### *The franchisee entities*

Defendants point out first that Plaintiffs were not parties
to the franchise agreements, and that, consequently, they lack
standing to pursue any claim on behalf of the franchisee entities
that operated the existing stores.  Moreover, Defendants aver,
any claims that could be brought in connection with the
franchisee entities have been resolved under the auspices of the
Chapter 11 bankruptcy action brought by the franchisees.

In their memorandum of law in opposition to Defendants'
motion, Plaintiffs essentially concede these points.  In a
footnote on page one, Plaintiffs write, "The Dunkin' Defendants'
argument is moot inasmuch as the Barkan Plaintiffs have asserted
no claims on behalf of the franchisee entities or for damages as
a result of the termination of the franchise agreements.  As the
Dunkin' Defendants are well aware, these matters were resolved
through the Bankruptcy proceedings."  Although Plaintiffs make
some statements concerning the demise of the existing donut shops
in their Complaint, a close examination of the Complaint
indicates that its primary focus is the lost value of the SDAs.
In paragraph 41 of the Complaint, Plaintiffs assert: "Because of
the Dunkin' Defendants' above-described wrongful actions which
resulted in the improper termination of the SDAs, the Barkan
Plaintiffs lost the value of the SDAs which were in an amount of
at least $3,000,000.00."  This dollar amount is the estimated

damages amount consistently sought in all portions of the
Complaint.  The Court accepts this as the accurate articulation
of Plaintiffs' claim, and will consequently analyze the
Plaintiffs' causes of action only as they relate to Plaintiffs'
rights under the SDAs.

### The SDAs

In connection with the SDAs, Defendants argue that Count III
must be dismissed as it relates to the Providence SDA and the
Cranston SDA because Plaintiffs' failure to open any 'specified
unit' under these contracts means that they had no transferable
rights.  If Plaintiffs had no rights to sell under the SDAs, then
Defendants' actions were not the cause of the breakdown of the
sale of Plaintiffs' so-called "donut shop business."   Plaintiffs
respond that Defendants' breach of the Settlement Agreement
prevented Plaintiffs from obtaining the financing necessary to
open the new stores.

The nub of Plaintiffs' claim is that Defendants' failure to
make a good faith attempt to arrange refinancing for Plaintiffs
through CIT resulted in the collapse of Plaintiffs' business –
both the bankruptcy of the existing franchisee operations, and
the ultimate inability of Plaintiffs to realize any financial
gain from the SDAs.  As explained above, Plaintiffs are not
pressing the part of the claim that involves the bankrupt stores.
If Plaintiffs can demonstrate, as they allege, that Defendants

not only scuttled Plaintiffs' efforts to obtain refinancing, but also that Defendants entered into the Settlement Agreement even though they had no intention of helping Plaintiffs obtain refinancing, then Plaintiffs may prevail on both Count II (Breach of the Express Terms of the Settlement Agreement) and Count III (Breach of the Convenant of Good Faith).  This is sufficient to survive a Motion to Dismiss under the liberal standard for notice pleading because it is a set of facts consistent with the allegations pled in the Complaint.  Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1969 (2007).  Accordingly, Defendants' Motion to Dismiss Count III of the Complaint is denied, and Plaintiffs (having withdrawn the portion of the claim which relates to the franchisee entities) may proceed on the portion of the claim that relates to the SDAs.

### Count IV - Violation of Massachusetts G.L. c. 93A

In Count IV Plaintiffs allege that Defendants engaged in unfair and deceptive acts in their business dealings, which took place in Massachusetts, in violation of Mass. G.L. c. 93A, §§ 2 and 11.  Defendants counter that Plaintiffs cannot pursue a claim for multiple damages, as provided by the statute, because they waived all claims for multiple damages in paragraph 18F of the SDAs, which waiver is incorporated by reference into the Settlement Agreement.  Furthermore, Defendants argue that Plaintiffs failed to send a demand letter thirty days prior to

-12-

the suit, as required by § 9 of the statute.

Setting these arguments to the side, the Court is constrained to point out that, in paragraph 20 of the Settlement Agreement, the parties elected to be governed by Rhode Island law.  The Rhode Island Supreme Court recognizes choice of law clauses such as this, and has observed that, "[A]s a general rule, parties are permitted to agree that the law of a particular jurisdiction will govern their transaction."  Sheer Asset Mgmt. Partners v. Lauro Thin Films, Inc., 731 A.2d 708, 710 (R.I. 1999).  This Court is compelled by the United States Supreme Court to follow the Rhode Island Supreme Court in the area of choice or conflict of laws.  Klaxon Co. v. Stentor Electric Mfg. Co., Inc., 313 U.S. 487, 496-497 (1941).

Because this dispute is governed by Rhode Island law, the claim under Chapter 93A must be dismissed.  In ePresence, Inc. v. Evolve Software, Inc., 190 F. Supp. 2d 159, (D. Mass. 2002), a case governed by California law, the District Court of Massachusetts wrote, "The mere fact that the defendant 'acted with bad motive' does not render the Agreement's choice of law provision inapplicable, but rather the critical question is whether the alleged bad conduct brings 'these claims outside the scope of the contractual language that says California law will govern.'" 190 F. Supp. at 164-165  (citing Northeast Data Sys. v. McDonnell Douglas Computer, 986 F.2d 607, 610 (1st Cir. 1993)).

In the present case, the alleged conduct described in Plaintiffs'
c. 93A claim is addressed in other counts in the Complaint, and
can be adequately addressed within the framework of Rhode Island
contract law.   Therefore, the motion to dismiss Count IV is
granted.

### Count V - Tortious Interference

In Count V, Plaintiffs allege that Defendants, in bad faith
and without justification, interfered with the prospective sale
of their 'donut shop businesses.'  Defendants mount the same
defenses to this claim as they did to Count III.  First, they
argue that Plaintiffs do not have standing to bring a claim
concerning the sale of the franchisee entities.   They argue
further that they were released by the Bankruptcy Court from all
claims brought by the franchisee entities.  Plaintiffs' footnote,
quoted above, similarly serves to make these arguments moot.
Plaintiffs assert that they are bringing no claims in connection
with the demise of their franchisee entities.

As for the SDAs, Defendants argue, again, that Plaintiffs
had no transferable rights in the Providence or Cranston SDAs
because they had failed to meet one of the preconditions for
their transfer - the opening of at least one 'specified unit.'
If Plaintiffs had no legal rights to transfer, Defendants argue,
then there was no prospective sale with which Defendants could
interfere.   In response, Plaintiffs accuse Defendants of engaging

in a circular argument, explaining that they were unable to develop the new stores because Defendants violated the Settlement Agreement by not helping them obtain financing.  Plaintiffs' argument, which is also somewhat circular, supports their claim for breach of the Settlement Agreement, but it does not provide much assistance to their tortious interference claim because their argument is based on the admission that they did not satisfy a precondition to the transfer of the SDAs.

A careful examination of the Store Development Agreements[2] leads the Court to conclude that Plaintiffs did not have an unfettered right to transfer the SDAs.  Defendants point to paragraph 13, section B, of the SDA which states that transferability is contingent upon the developer having "opened at least one Specified Unit covered by this Agreement." Defendants assert, and Plaintiffs do not dispute, that Plaintiffs never opened any store pursuant to the Cranston or Providence SDAs.  But over and above the number of stores opened or unopened, the list of contingencies and conditions that Plaintiffs must satisfy in order to sell their rights under the SDAs includes over sixteen provisions, including: 1) a term stating that any transfer required Defendants' prior written consent (introductory paragraph); 2) a term requiring that

---

[2] The SDAs are each fifteen pages of virtually identical boilerplate language, differing only in a few specified items.

-15-

Developer shall have fully satisfied all financial obligations to
Defendants, and pay a transfer fee for each SDA (¶ M); and 3) a
term providing that the transferee must satisfy certain criteria
established by Defendants and must be approved by Defendants (¶
A). If Defendants had a right to be involved to this extent in
the negotiations for the sale or transfer of the SDAs to a third
party, then their role in those negotiations was justified and
cannot be characterized as improper interference.

In <u>Belliveau Bldg. orp. v. O'Coin</u>, 763 A.2d 622 (R.I. 2000),
the Rhode Island Supreme Court held that it was not improper
interference for O'Coin to publish a notice of her right of first
refusal to purchase Belliveau's real estate, even though it
derailed Belliveau's purchase and sale agreement with a third
party. The Court held that O'Coin's actions were justified
because O'Coin was asserting a legally recognized privilege. 763
A.2d at 627. In its discussion of the defense of privilege, the
Supreme Court refers to the concept of qualified privilege in
slander-of-title actions by which the claimant is able to
preserve the enforceability of a claim. 763 A.2d at 629. More
germane to the case before this Court, the Supreme Court also
discusses the 'bona fide claim' defense to an allegation of
tortious interference, and quotes the relevant provision from the
Restatement (Second) of Torts:

> One who, by asserting in good faith a legally
> protected interest of his own or threatening

-16-

> in good faith to protect the interest by
> appropriate means, intentionally causes a
> third person not to perform an existing
> contract or enter into a prospective
> contractual relation with another does not
> interfere improperly with the other's
> relation if the actor believes that his
> interest may otherwise be impaired or
> destroyed by the performance of the contract
> or transaction.  Id. § 773 at 52.

763 A.2d at 629.  *See also* <u>Pharmacy Services Inc. v. Swarovski</u>

<u>North America Ltd.</u>, 2006 WL 753055 (D.R.I.), and <u>Tidewater</u>

<u>Realty, LLC, v. State of Rhode Island</u>, 2000 WL 34601782 (R.I.

Super.).

In the present case, the Court holds that Defendants had a

bona fide interest to protect in the transfer of the SDAs to a

third party.  Their efforts to safeguard that interest by getting

involved in Plaintiffs' negotiations to sell the SDAS are

therefore privileged and legally justified.  Consequently,

Plaintiffs' claim in Count V for tortious interference in a

prospective advantageous business relationship is dismissed.

### Motion to Strike

Defendants also move to strike Plaintiffs' claim for

multiple damages and their claim for a jury trial.  Plaintiffs'

only demand for multiple damages is associated with Count IV,

their claim under Massachusetts statute, G.L. c. 93A, which the

Court has already dismissed.  Accordingly, Defendants' motion to

strike Plaintiffs' claim for multiple damages is moot.

-17-

### *Motion to strike demand for a jury trial*

Plaintiffs request a jury trial on all issues so triable. Defendants argue that Plaintiffs waived their right to a jury trial in the Settlement Agreement and the SDAs. Defendants are correct that the SDAs contained an express waiver of a jury trial in an eye-catching format replicated below:

> **Waiver of Rights.** THE PARTIES HERETO AND EACH OF THEM KNOWINGLY, VOLUNTARILY AND INTENTIONALLY AGREE AS FOLLOWS:
> (1)   The parties hereto and each of them EXPRESSLY WAIVE(S) THE RIGHT ANY MAY HAVE TO A TRIAL BY JURY...

SDA, ¶ 18F.  The question that must be settled by the Court is whether that waiver is effectively incorporated into the Settlement Agreement, which is the document giving rise to the present action.  The Settlement Agreement contains no express jury waiver provision, but its opening recitals refer to the various franchise agreements and SDAS, and paragraph one states, "1.  The above mentioned recitals are true and correct and with all instruments referenced therein, are incorporated herein by reference."

Defendants argue that jury waiver clauses, such as the one found in the SDAs, are enforceable, and cite to this writer's earlier decision in <u>Connecticut Nat. Bank v. Smith</u>, 826 F. Supp. 57 (D.R.I. 1993), which enumerates the criteria for evaluating the parties' intentions in entering into an agreement to waive

their right to a jury trial.  826 F. Supp. at 60-61.  Although it
is unlikely that Plaintiffs negotiated any of the terms of the
SDAs, the Court has little doubt that the SDAs' unambiguous jury
waiver provision would indeed be enforceable – if the present
dispute concerned the terms of one of the SDAs.  However, as the
Plaintiffs point out, the dispute between the parties arises
under the Settlement Agreement, a separate and distinct document
executed by the parties over a year after the last SDA was drawn
up.

Defendants cite the Rhode Island Supreme Court's decision in
R.I. DEPCO v. Coffey & Martinelli, Ltd., 821 A.2d 222 (R.I.
2003), where a jury trial waiver in one document was applicable
to several other documents recording two loans and a line of
credit issued by a credit union to a law firm.  The Court
determined that language in the loan agreement indicated that all
three transactions should be considered as "part of a single,
continuing transaction."  821 A.2d at 227.  This determination
brought the credit union transaction into the precedential shadow
of Rotelli v. Catanzaro, 686 A.2d 91 (R.I. 1996), also cited by
Defendants herein, where the Supreme Court concluded that,
"instruments executed in the course of a single transaction at
the same time and to accomplish the same purpose should be read
and construed together."  R.I. DEPCO, 821 A.2d at 226.

In an action based on federal diversity jurisdiction, the

-19-

right to a jury trial is determined according to federal law. Simler v. Conner, 372 U.S. 221, 222 (1963). "The federal policy favoring jury trials is of historic and continuing strength," Simler, 372 U.S. at 222, such that this Court must "indulge every reasonable presumption against waiver." Aetna Ins. Co. v. Kennedy, 301 U.S. 389, 393 (1937); *see also* Medical Air Tech. Corp. v. Marwan Inv., Inc., 303 F.3d 11, 18 (1st Cir. 2002).

Taking this policy into account, along with 1) the adhesive nature of the contractual terms of the SDAs, 2) the break in time between the execution of the SDAs and the execution of the Settlement Agreement,[3] and 3) the completely different purposes of the SDAs and the Settlement Agreement, the Court declines to import the jury waiver provision from the SDAs into the Settlement Agreement. Accordingly, Defendants' Motion to Strike Plaintiffs' jury demand is denied.

## Conclusion

For the reasons stated above, the Court denies Defendants' Motion to Dismiss Count III (Breach of Covenant of Good Faith and Fair Dealing in the Agreement), but grants Defendants' Motion to Dismiss Count IV (Violation of Massachusetts G.L. c. 93A) and Count V (Tortious Interference). Further, the Court denies Defendants' Motion to Strike Plaintiffs' jury demand.

---

[3] The SDAs were executed on various dates between May 2002 and March 2003. The parties entered into the Settlement Agreement in June 2004.

Defendants' Motion to Strike Plaintiffs' demand for multiple damages is rendered moot by the dismissal of Count IV.  No judgment shall enter at this time.

Ronald R. Lagueux
Senior United States District Judge
October 30, 2007