UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

IRWIN J. BARKAN and　　　　　　：
D&D BARKAN LLC　　　　　　　　：
　　　　　　　　　　　　　　　　：
　　　　v.　　　　　　　　　　　：　　C.A. No. 05-050L
　　　　　　　　　　　　　　　　：
DUNKIN' DONUTS, INC. and　　　　：
BASKIN-ROBBINS USA, CO.　　　　：

## REPORT AND RECOMMENDATION

Lincoln D. Almond, United States Magistrate Judge

Before the Court is Defendants' Motion for Summary Judgment. (Document No. 110).

Plaintiffs object. (Document No. 115). This Motion was referred to me by Senior Judge

Lagueux for preliminary review, findings and recommended disposition. 28 U.S.C. §

636(b)(1)(B); LR Cv 72(a). Defendants did not request oral argument on their Motion, and, after

reviewing the pleadings, I determined that oral argument was not necessary. After reviewing the

Memoranda and voluminous exhibits submitted, I recommend that Defendants' Motion for

Summary Judgment (Document No. 110) be DENIED.[1]

### Facts

In considering this Motion, the Court must view the evidence in a light most favorable

to the non-moving party. The following "facts" are culled from the parties' Local Rule 56

Statements of Fact.

---

[1] Along with their Objection, Plaintiffs filed a Motion to Strike, requesting that the entire record submitted by Defendants in support of their Motion for Summary Judgment be stricken. (Document No. 114). Plaintiffs allege that Dunkin' failed to comply with multiple federal and local rules in connection with the filing of its summary judgment exhibits. In view of my recommendation that Defendants' Motion for Summary Judgment be DENIED, Plaintiffs' Motion to Strike (Document No. 114) is DENIED as moot.

Plaintiff D&D Barkan LLC ("D&D") is a Rhode Island limited liability company, principally owned by Plaintiff Irwin J. Barkan. Defendant Dunkin' Donuts, Inc. is a Delaware corporation. Defendant Baskin-Robbins USA Co. is a California corporation. Defendants are collectively referred to as "Dunkin'" herein.

At various times in 2001 and 2002, Dunkin' entered into five separate written franchise agreements with legal entities wholly owned by Barkan for the operation of five Providence shops. Those entities were DDB Westminster LLC, the franchisee of a shop on Westminster Street; DDB Fountain LLC, the franchisee of a shop on Fountain Street; DDB Empire LLC, the franchisee of a shop on Empire Street; DDB Dorrance LLC, the franchisee of a shop on Dorrance Street; and DDB Weybosset LLC, the franchisee of a shop on Weybosset Street (collectively, the "Franchisee Entities").

In May 2002, Barkan, through D&D, purchased a Store Development Agreement ("SDA") from Dunkin' by which D&D acquired the right to develop two shops (a Baskin/Dunkin' "combo," and a Dunkin' "solo" unit) in a specified area of Providence, Rhode Island ("Providence SDA") by December 17, 2003 (the "combo") and December 17, 2004 (the "solo"). The $80,000.00 fee for the SDA was included in the purchase price Barkan paid for the existing shops.

In 2003, Barkan, individually, and Dunkin' entered into three additional SDAs by which Barkan acquired the right to develop additional shops in portions of East Greenwich ("East Greenwich SDA"), Burrillville ("Burrillville SDA") and Cranston, Rhode Island ("Cranston SDA"). The East Greenwich SDA gave Irwin Barkan the right to develop a Baskin/Dunkin'

combo by June 1, 2004, and a Dunkin' solo unit by June 1, 2005 in specified areas (a portion of New London Turnpike and the Warwick Mall Food Court). The total fee for the East Greenwich SDA was $100,000.00, of which Barkan paid $33,334.00, and was to pay $33,333.00 by January 24, 2004, and the balance by January 24, 2005. The Burrillville SDA gave Irwin Barkan the right to develop a Baskin/Dunkin' combo by May 1, 2004, and a Dunkin' solo unit by November 1, 2004 in a specified area of Burrillville and along a specified stretch of Pontiac Avenue in Cranston. The total fee for the Burrillville SDA was $100,000.00, of which Barkan paid $33,334.00, and was to pay $33,333.00 by December 26, 2003, and the balance by December 26, 2004. The Cranston SDA gave Irwin Barkan the right to develop a Baskin/Dunkin' combo by June 1, 2004, and a Dunkin' solo unit by December 1, 2004 in a specified area of Cranston and in Wayland Square, Providence. The total fee for the Cranston SDA was $100,000.00, of which Barkan paid $33,334.00, and was to pay $33,333.00 by January 16, 2004, and the balance by January 16, 2005.

The SDAs gave the "Developer" (D&D in the Providence SDA and Barkan in the remaining SDAs) the exclusive right for a limited time to develop, construct and open a specified number of Dunkin' Donuts shops in a defined area. Under the SDA, each unit to be opened was referred to as a "Specified Unit." The SDAs also included several restrictions on the Developer's ability to sell or otherwise transfer its development rights under the SDAs, including that, prior to any transfer, "Developer must have opened at least one Specified Unit covered by this [SDA] Agreement." Under each Franchise Agreement, the Franchisee was to pay a continuing weekly royalty and a weekly advertising fee. Barkan personally guaranteed all

obligations to Dunkin' under the Franchise Agreements.  Under each SDA, the Developer agreed to pay Dunkin' an SDA fee equal to the number of Dunkin' Donuts shops covered by the SDA multiplied by the initial franchise fee for each shop. For example, under the Providence SDA, Barkan purchased the exclusive right for three years to develop two shops within a specified area. His SDA fee for the Providence SDA was $80,000.00  The CIT Group ("CIT") provided financing for the Barkan D&D entities.

During 2002 and 2003, the Barkan Franchisee Entities operated at a loss.  In October 2003, Barkan made a presentation to multiple Dunkin' employees, in which he discussed the cash flow losses for its existing shops and its desire to refinance its debt.  Following that presentation, Barkan entered into discussions with Dunkin' concerning a potential refinancing with CIT.  In response, Barkan agreed that sale of the Providence stores should be pursued, and that "in its absence..., or more cash flow relief from Allied Domecq Quick Service Restaurants ("ADQSR") we will find ourselves in an untenable situation which could be unwelcome for both D&D Barkan and Allied."

On November 13, 2003, Barkan expressly threatened to sue Dunkin'.  Later that month, the Barkan entities received notices to cure default.  Thereafter, on December 3, 2003, Barkan's current pro hac vice counsel Richard Gelb ("Gelb") wrote Dunkin' counsel, seeking to meet to discuss the notices and issues related to store performance. Dunkin's in-house counsel Lionel J. Remillard ("Remillard") replied to Gelb, advising that there would be no meeting, and that Barkan would soon hear from Dunkin's business people.

On December 5, 2003, Daniel P. Connelly, Strategic Asset Manager ("Connelly") wrote Barkan, offering that Dunkin' [then ADQSR] would "agree to work with CIT to attempt to re-finance your existing debt."  Connelly's letter contained a draft Settlement Agreement, asked Barkan to "sign a settlement agreement in the form attached," and to return a counter-signed copy of the letter by December 16, 2003, so that the parties could finalize the necessary documentation by December 23, 2003, including extension of the cure deadlines in the November 25, 2003 notices.  In reply, Barkan and his lawyers began a series of negotiations over the contents of the Settlement Agreement that extended from December 2003 through June 15, 2004.  During these negotiations, Barkan remained behind on the loan payments to CIT.

On February 4, 2004, Barkan wrote Connelly that "all the CIT outstanding obligations and the work-out of future re-structuring have been in the hands of our lawyers, and, I understand are the subject of the discussions with Bud Remillard. We are relying on them to resolve these issues in a single agreement, including outstanding obligations."  In response, Connelly urged Barkan to honor his CIT obligations, and asked that Barkan "understand that your lack of CIT payments puts serious strain on our ability to forge a meaningful workout plan."

On February 10, 2004, Connelly urged Barkan to work with his attorneys to finalize the Settlement Agreement, and remain current on all his obligations to Dunkin' and CIT. On March 2, 2004, Dunkin' issued an additional notice to Barkan, advising of its default under the Providence SDA for the failure to meet its development schedule.  By March 2004, Barkan's lawyers were sending stand-still or forbearance agreements to Dunkin.'

On March 31, 2004, Bethany Blowers ("Blowers") of Dunkin' asked Laura Sneed ("Sneed"), her contact at CIT, to permit Barkan to make interest-only payments on his CIT loans. Blowers was a Treasury Department Manager at Dunkin' who was responsible for day-to-day communications with CIT concerning CIT's portfolio of loans to Dunkin' franchisees. Sneed was Blowers' main contact at CIT. Sneed was a Portfolio Specialist at CIT in Phoenix, Arizona. As a Portfolio Specialist, she was the initial point of contact with the customer who requested a restructure, and would work with the customer to obtain information and assess the request.

Blowers "wanted a longer term with interest only," but CIT was only willing to allow Barkan to make interest-only payments for four months. Blowers also asked CIT to extend the term of Barkan's loan, but Sneed refused. After the four-month interest-only period, the loans would go back to normal, principal and interest payments, without any change in the original loan terms. "This is the only way CIT is able to do the interest only period," as Blowers wrote Connelly on March 31, 2004. In response to Dunkin's request, on March 31, 2004, Sneed sent Blowers a standard form application by e-mail to be completed by Barkan and returned to CIT, along with financial statements of the Franchisee Entities.

On April 1, 2004, Blowers forwarded the CIT application papers to Irwin Barkan who said he would complete them and call CIT that day. He thanked Blowers "for putting the CIT mechanics in motion," and asked her to attempt to negotiate a reduced fee from CIT on his behalf. On April 5, 2004, Barkan spoke directly with Sneed to attempt to negotiate a lower fee

for his refinance. She told him that CIT "has" to charge us some fee, and they agreed on $1,000.00 per loan, or $7,000.00 in all.

Sneed had no authority to restructure or refinance loans on behalf of CIT to Barkan because the aggregate size of his loans exceeded her authority. Shelly Rush ("Rush") of CIT had this authority. Rush did not have to report to anyone else on her decision since the restructuring was within her credit limits. Rush learned from Sneed that Barkan "was looking to restructure [their] notes." In that same conversation with Sneed, Rush learned that Sneed had sent "our standard letter which sets forth our requirements."

By April 7, 2004, Dunkin' had paid $104,104.63 in cure payments to CIT regarding Barkan's CIT debt. Sneed tracked each of Dunkin's cure payments. On April 13, 2004, Barkan asked Blowers to

> let me know how you make out with Laura [Sneed] on 6 months with a 6 month extension on the restructure term. This is a more realistic time frame to properly market and close the complex sale of 4 stores and SDA's. I am anxious to finalize the docs soon, pay the arrearages and move ahead so we can close on the first new store in Burrillville. Beth [Blowers], thanks for all your help and support throughout this process.

On April 14, 2004, Blowers reported to Barkan that "Laura [Sneed] at CIT was willing to extend the interest only period to 6 months while you are trying to sell the stores. In agreeing to this she will not be able to extend any of the terms on the original loan contracts, they will have to remain the same." Blowers also advised Barkan that while she had tried to reduce Barkan's fee to CIT for the interest-only accommodation, the best she could do was $1,000.00 per loan contract, or $7,000.00 in all. On April 14, 2004, Barkan replied, "[t]his sounds great,

-7-

thank you very much." He told Blowers that he hoped to "be able to close it all up, pay the fee and the Empire interest by mid next week." Blowers said that sounded "great" and asked if there was anything else she could do.

On May 3, 2004, Sneed sent recourse letters to Blowers. According to Sneed, she sent the recourse letters in error, and should not have sent them until the refinance was approved. In fact, Sneed did not have the authority to send the recourse letters to Dunkin'.  According to Rush, signed recourse letters were not a consideration or requirement for refinancing.

By May 28, 2004, Dunkin' had paid $159,372.91 in cure payments to CIT regarding continuing defaults by Barkan, D&D and the Franchisee Entities.  On June 6, 2004, Barkan unilaterally terminated development of a proposed site in East Greenwich because of an inability to obtain financing and local zoning issues.

In June 2004, Barkan signed the Settlement Agreement.  By that time, "interest only" for six months was the most CIT would do, and then only if Barkan paid a $7,000.00 fee, which he never paid. Shortly after Barkan signed the Settlement Agreement, Dunkin' counter-signed it.

On June 17, 2004 at 7:32 p.m., Barkan emailed Blowers, advising that he had signed the Settlement Agreement, and asked what the next step with CIT was.  On June 18, 2004, Blowers asked for confirmation that the "settlement agreement has truly been signed and that I have the green light to move forward with refinancing his CIT loans."

In the Settlement Agreement, Barkan, D&D and the Franchisee Entities agreed "from and after the week ending November 23, 2003...to timely pay" all rents and fees dues Dunkin' under leases and franchise agreements, and to pay all arrearages on execution of the Settlement

Agreement. Additionally, Barkan, D&D and the Franchisee Entities acknowledged that they "currently have $1,571,421.50 in financing with the CIT Group ("CIT");" that they were in default of such financing; that Dunkin' had made cure payments on their behalf of $159,372.91; and that they "have agreed not to further default under such financing, and to timely make all payments due thereunder." Dunkin' also agreed to work with Barkan, D&D and the Franchisee Entities, to attempt to refinance their debt with CIT and to amend the SDAs, primarily by adjusting the dates certain obligations were due. Barkan stated he did not know whether Dunkin' requested the refinancing from CIT. Barkan also acknowledged that he had no basis to dispute that the recourse letters were sent in error.

Barkan, D&D and the Franchisee Entities agreed to release any claims against Dunkin' and to remain current on all of its obligations under the Settlement Agreement, the Franchise Agreements, and other agreements entered into with third parties in connection with the franchises, including their obligations to make current payments to CIT. The Settlement Agreement also stated:

> FRANCHISOR [Defendants and Third Dunkin' Donuts Realty, Inc.] hereby agrees to work with FRANCHISEES [Plaintiffs and the Barkan corporate entities] and CIT to attempt to re-finance such existing debt. Specifically, FRANCHISOR will request that CIT issue a new note for the current balance of the financing, including interest and cure payments...In addition to all documents required by the CIT group, such refinancing shall be secured by one or more security agreements...FRANCHISOR makes no representation that CIT will provide such financing.

After Sneed told Rush that she had sent the application letter, Rush did not closely monitor Sneed's work on the restructuring request. From time to time, Rush would ask Sneed

where she stood on the request, and Sneed would reply that she was waiting for information. Sneed subsequently received financial information from Barkan which she put on Rush's desk. The information was illegible, improperly formatted, not in proper columns, on overlapping legal size pages, and Rush could not read it. Rush asked Sneed to reformat the information. Sneed did reformat the information but Rush apparently was still unable to interpret the financial statements.

Rush did not feel it was her obligation or necessarily in the best interests of the customer (Barkan) to sort through a lot of detail and perhaps draw erroneous conclusions. Rush asked Sneed to call Blowers and ask about the situation. Rush then asked Blowers if any of the stores were closed, and Blowers replied that two stores were closed. In the call, Rush asked Blowers "what's going on with this customer," and complained that she had lots of financial information that she could not decipher. Rush recalls that Blowers said she could not really share the information with her, and that Blowers was not forthcoming with information. When Rush pressed her for information about this "distressed network," she stated "[o]ut of respect for Irwin [Barkan], I didn't talk about that stuff." According to Rush, the call ended with her saying "something to the effect of I'm not really sure what to do now."

On June 23, 2004, Blowers, at CIT's request, asked Barkan to prepare an updated business plan for CIT's review. Following her call with Blowers, Rush spoke to the Credit Department at CIT and learned that Dunkin' would have to repurchase the CIT loans for the two closed stores and that no more cures of those defaulted loans would be permitted. Following her

call with Blowers, Rush had questions and believed that she needed more information about the store closings to assess what to do with all the other accounts.

On July 8, 2004, Barkan emailed Blowers, saying that he had attached a business plan and financial line statements which he wanted her to review and forward to CIT.  Barkan also sent a copy of his email to Blowers and its attachments to his chief in-house accountant Gary Urso. Despite his statement that he had attached a business plan to his email, Barkan had, by error, attached two copies of financial statements and no business plan.  Barkan did not discover his error nor did Urso or Blowers. On July 9, 2004, Blowers forwarded to Sneed an email and two attachments from Barkan which said it contained a business plan (but did not).

Barkan did not make monthly payments on its loans to CIT before or after the Settlement Agreement.  The defaults began in October 2003 and continued each month until Dunkin' was required by CIT to repurchase the loans in their entirety. Barkan alleges that he was informed that CIT denied his request for restructuring in July 2004.  Barkan claims that he was told not to make monthly payments while his situation was in flux because Dunkin' would make cure payments until new financing was in place. The only deciding factor that Sneed was aware of as to why CIT did not agree to refinance the loans was the permanent store closings.

On July 23, 2004, Blowers, Rush and Sneed spoke again. Rush told Blowers that CIT would not refinance Barkan's existing loans, and that Dunkin' would have to repurchase them from CIT.  "Based on the cure payments...the overall situation and what they'd seen, that it was sort of a Band-Aid on the wound, it wasn't going to help him in the long run, and that they didn't

feel comfortable doing the deal." Blowers was surprised, "horrified really," to hear CIT's decision.

Barkan claims that Dunkin' failed to "work with" CIT because: (1) Blowers did not sign recourse letters; (2) Blowers did not tell CIT that Dunkin's Finance Committee had approved the Settlement Agreement; (3) Blowers did not provide CIT with Barkan's narrative business plan; and (4) Blowers did not provide Rush with detailed information about Barkan's closed stores. Barkan also claims that Dunkin' "did not make a positive effort," and failed to advocate for the loan. Barkan also alleges that CIT would have refinanced but for Dunkin's alleged failures based upon comments he attributes to Sneed and certain Dunkin' representatives.

Blowers had a follow-up conversation with Barkan in which she informed him that CIT would not refinance the existing debt. On June 9, 2004, Barkan wrote Connelly, telling him that the four SDAs were worth in the aggregate $160,000.00 to $200,000.00.

By notice of default and notice to cure on December 7, 2004, Dunkin' advised Barkan that he failed to meet the development schedule for the Cranston SDA by not opening a Specified Unit by June 1, 2004. Thereafter, on January 31, 2005, Dunkin' advised Barkan that the Cranston SDA was terminated.

By notice of default and notice to cure on December 7, 2004, Dunkin' advised Barkan that he failed to meet the development schedule for the Burrillville SDA by not opening a Specified Unit by November 1, 2004. Thereafter, on January 31, 2005, Dunkin' advised Barkan that the Burrillville SDA was terminated.

By notice of default and notice to cure on December 7, 2004, Dunkin' advised Barkan that he failed to meet the development schedule for the Providence SDA by not opening a Specified Unit by December 17, 2003. Thereafter, on January 31, 2005, Dunkin' advised Barkan that the Providence SDA was terminated.

By notice of default and notice to cure on December 7, 2004, Dunkin' advised Barkan that he failed to meet the development schedule for the East Greenwich SDA by not opening a Specified Unit by June 1, 2004. Thereafter, on January 31, 2005, Dunkin' advised Barkan that the East Greenwich SDA was terminated.

By notice of default/notice to cure letter dated January 31, 2005, Dunkin' notified Barkan, D&D and the Franchisee Entities that they were in default of the Settlement Agreement. The notice of default/notice to cure gave Barkan, D&D and the Franchisee Entities seven days to cure their defaults as specified in the Settlement Agreement. Additionally, it advised Barkan and D&D (and the Franchisee Entities) that "payment of such amount [$1,874,122.40] shall in no way affect or limit any notice of termination issued with respect to any of your Store Development Agreements." The notice of default/notice to cure itemized defaults owing Dunkin' under Lease Agreements totaling $14,899.98.  The notice of default/notice to cure itemized defaults owing to CIT, which Dunkin' had paid, totaling $1,658,027.96.  The notice of default/notice to cure itemized defaults owing under Franchise Agreements totaling $1,196.57. The notice of default/notice to cure itemized defaults totaling $199,998.00 owing under SDAs as follows: failure to pay installments totaling $66,666.00 due January 2004 and January 2005 under PC 338851 (East Greenwich SDA); failure to pay installments totaling $66,666.00 due

December 2003 and December 2004 under PC 338850 (Burrillville SDA) and failure to pay installments totaling $66,666.00 due January 2004 and January 2005 under PC 339047 (Cranston SDA). The notice of default advised Barkan and D&D and that they had seven days to cure their financial defaults under the SDAs by paying $199,998.00.  Barkan and D&D did not cure any defaults under the SDAs. They did not pay any of the installments that the Settlement Agreement had adjusted, nor did they develop any Specified Units under any of the SDAs, except for a single unit in Burrillville in June 2004.  Barkan admits that it did not have a specific location for three of its prospective stores, and did not have any control over any sites for prospective development of these stores. Barkan failed to meet the development deadlines with respect to each of the SDAs for which Barkan seeks damages in this suit.

On February 14, 2005, the Franchisee Entities filed bankruptcy petitions with the United States Bankruptcy Court for the District of Rhode Island, CA. Nos. 05-10427, 05-10428, 05-10429, 05-10430, 05-10431, 05-10432 and 05-10433. Barkan did not file bankruptcy personally or on behalf of D&D Barkan LLC.

In the Settlement Agreement, Dunkin' made no representation that CIT would provide financing, and the Settlement Agreement expressly so provided.  SDAs are transferable, subject to compliance with their terms and conditions, only to other Dunkin' franchisees in good standing.  Dunkin' has a right under the SDAs to review and approve the proposed transfer of an SDA from one franchisee to another franchisee. An SDA can be transferred without the existing stores being transferred.

-14-

Barkan and D&D have asserted claims for the "lost value of SDAs." Barkan's and D&D's expert selected December 31, 2004 as a start date for his damages analysis based upon his understanding as to the approximate date on which CIT officially declined to refinance Barkan. Barkan alleges that in December 2004, he spoke with Sneed who informed him that the processing of his refinancing stopped because Dunkin's paperwork had not been completed and transmitted to CIT.

### Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When deciding a motion for summary judgment, the Court must review the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. Cadle Co. v. Hayes, 116 F.3d 957, 959 (1st Cir. 1997).

Summary judgment involves shifting burdens between the moving and nonmoving parties. Initially, the burden requires the moving party to aver "an absence of evidence to support the nonmoving party's case." Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554, 91 L. Ed. 2d 265 (1986)). Once the moving party meets this burden, the burden falls upon the nonmoving party, who must oppose the motion by presenting facts that show a genuine "trialworthy issue remains." Cadle, 116 F.3d at 960 (citing Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995); Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir.

1994)).  An issue of fact is "genuine" if it "may reasonably be resolved in favor of either party." Id. (citing Maldonado-Denis, 23 F.3d at 581).

To oppose the motion successfully, the nonmoving party must present affirmative evidence to rebut the motion.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256-57, 106 S. Ct. 2505, 2514-2515, 91 L. Ed. 2d 202 (1986).  "Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, [or] unsupported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).  Moreover, the "evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve."  Id. (quoting Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989)). Therefore, to defeat a properly supported motion for summary judgment, the nonmoving party must establish a trialworthy issue by presenting "enough competent evidence to enable a finding favorable to the nonmoving party."  Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993) (citing Anderson, 477 U.S. at 249).

### 1.    Breach of the Settlement Agreement

Dunkin' moves for summary judgment in its favor, claiming it complied with all aspects of the Settlement Agreement.  Barkan asserts that Dunkin' failed to use "best efforts" as required under the Agreement, that Dunkin' breached the implied covenant of good faith and fair dealing and that, in any event, Barkan was excused from performing under the Agreement as a result of Dunkin's material breach.

One of the primary points of contention between the parties is whether Dunkin' complied with its obligation under paragraph 4 of the Settlement Agreement to "work with" CIT to aid Barkan in attempting to refinance its debt. It is undisputed that Barkan was not successful in refinancing with CIT.  Whether Dunkin' complied with the language which required it to "work with" Barkan to obtain refinancing with CIT is rife with factual disputes.

Dunkin' claims, for example, that it began to "work with" Barkan in 2003, prior to the Settlement Agreement being signed.  Dunkin' alleges that Connelly diligently worked with Blowers to assist Barkan in obtaining refinancing from CIT.  Dunkin' claims that it worked with Barkan, but that Barkan was unable to refinance due to his own shortcomings.   Dunkin' specifically alleges that Barkan's "uncreditworthiness" coupled with "escalating debts to Dunkin' under the Franchise Agreements, failures to pay fees and develop under the SDAs, continuing failures to pay CIT and threats of suit" were the causes for his failure to obtain refinancing with CIT.  (Document No. 110-2 at pp. 6, 8, 10).

Barkan, on the other hand, alleges that Dunkin' failed to "request the financing from CIT" and this omission was a breach of the Settlement Agreement.  (Document No. 31, ¶ 50).  Barkan also alleges that Blowers failed to give "recourse" letters to CIT, notification that the Dunkin' Finance Committee had approved refinancing, Barkan's narrative business plan, and other information to Rush regarding Barkan's closed stores.  (Document No. 111, ¶ 107; Document No. 118, ¶ 105.)  Finally, Barkan claims that Sneed told him that CIT denied the refinancing because Dunkin' failed to submit necessary paperwork.  Id.

-17-

The Court need not further delve into the factual quagmire presented by the parties.  The Court's brief recitation of the parties' factual presentations demonstrates that there are multiple disputed issues of material fact.  Because these factual controversies could be reasonably resolved in favor of either party, summary judgment is not appropriate at this stage of the proceedings.

### 2.      Breach of the Implied Duty of Good Faith and Fair Dealing

Dunkin' asserts that Count III of the Amended Complaint claiming breach of the implied covenant of good faith and fair dealing, is insufficient as a matter of law and should be dismissed.  Count III provides that by engaging in the wrongful conduct alleged in the Amended Complaint (including refusing, or indicating that they would refuse, to approve a sale of Barkan's business), Defendants acted with "improper motive in bad faith" when they exercised their contractual discretion to terminate.  Dunkin' supports its Motion by arguing that the facts underlying the claim for breach of the implied covenant of good faith and fair dealing are identical to the factual claims underlying the breach of contract count.  Accordingly, Dunkin' asserts that the count is insufficient as a matter of law under Roy v. Gen. Elec. Co., 544 F. Supp. 2d 103, 109-110 (D.R.I. 2008).  Barkan claims that there are disputed issues of fact "as to Dunkin's motive not to employ best efforts under the Settlement Agreement." (Document No. 115 at p. 16).  Barkan argues that it is the jury's task to determine Dunkin's "intent to perform" and "motive underlying its conduct."  Id.

Dunkin's reliance on the Roy v. General Elec. case is misplaced as Judge Smith was applying New York and not Rhode Island law which differs on this issue.  See P.S.W., Inc. v.

VISA U.S.A., Inc., C.A. No. 04-347T, 2006 WL 519670 at *15 (D.R.I. 2006) (noting that New York law treats breach of contract and good faith and fair dealing claims based on the same facts as "redundant"). Dunkin' has not cited any authority to support the application of this New York rule to a case construed under Rhode Island law. In Hord Corp. v. Polymer Research Corp. of Am., 275 F. Supp. 2d 229, 237 (D.R.I. 2003), Senior Judge Lagueux noted that "[w]hile every breach of the covenant of good faith and fair dealing implicates a breach of contract, not every breach of contract necessarily involves a breach of the covenant." If Dunkin' had established no breach of contract as a matter of law with the instant Motion, its argument that the breach of covenant claim should also fail may have had merit. However, as noted above, Dunkin' has not shown the lack of any genuine issues of material fact on the breach of contract claim and thus it has shown no legal impediment at this stage to Barkan's companion breach of covenant claim. As previously held by Senior Judge Lagueux in this case, "[i]f Plaintiffs can demonstrate, as they allege, that Defendants not only scuttled Plaintiffs' efforts to obtain refinancing, but also that they entered into the Settlement Agreement even though they had no intention of helping Plaintiffs obtain refinancing, then Plaintiffs may prevail on both Count II (Breach of the Express Terms of the Settlement Agreement) and Count III (Breach of the Covenant of Good Faith)." Barkan v. Dunkin' Donuts, 520 F. Supp. 2d 333, 339 (D.R.I. 2007). Thus, I recommend that Dunkin's Motion be DENIED as to Count III.

### 3.   Barkan's Failure to Perform Under the Agreement

Dunkin' asserts that, as a result of Barkan's breaches of the Settlement Agreement, Barkan cannot seek to enforce the Agreement against Dunkin'. Barkan, on the other hand,

claims that Dunkin' materially breached the Agreement, which therefore excused Barkan's performance under it.  Because I have found that there are genuine disputes as to material facts concerning the alleged breach of the Agreement, I recommend that Dunkin's Motion for Summary Judgment as to Barkan's failure to perform under the Agreement also be DENIED since the same facts are in dispute.

### 4. Whether Barkan Would Have Received Financing But For Dunkin's Alleged Breach

Dunkin' alleges that Barkan's claims fail as a matter of law because Barkan would not have received refinancing from CIT even in the absence of the alleged breach.  Again, the facts at the core of this issue are the same central disputed facts.  In sum, Barkan claims, and Dunkin' disputes, that Sneed told him that the refinancing was denied because Dunkin' failed to submit required paperwork.  (Document No. 111 at ¶¶ 105, 107).  Moreover, Barkan claims that Dunkin' CEO Jon Luther explained that "CIT does what I tell them to do."  Id. at ¶ 107.  Barkan also claims he was told that CIT never turned down a loan that was guaranteed by Dunkin'.  Id. Barkan points to each of these facts as evidence that his entities would have received financing from CIT but for the alleged breach by Dunkin'.  These facts, viewed in a light most favorable to Barkan, create a genuine factual dispute which precludes entry of summary judgment at this time.

### 5. Whether Barkan Would Have Been Able to Finance and Develop New Locations Under the SDAs

Dunkin' also claims it is entitled to entry of summary judgment because Barkan cannot prove he would have been able to finance and develop new locations under the SDAs.  Dunkin'

claims that "Barkan's own inability to meet its obligations under its SDAs was the sole reason why Barkan lost its SDAs." (Document No. 115 at p. 21). Dunkin' asserts that because Barkan would not have been able to finance and develop locations on its own regardless of Dunkin's alleged breach, Barrkan's case fails for lack of actual, "but for" causation. Id. at 22. Barkan, on the other hand, claims that Dunkin's breach of the Settlement Agreement prevented it from obtaining financing necessary to open new stores. The factual controversy which underlies the breach of contract claim also prevents entry of summary judgment on this count.

6.      **Damages**

The final issue is the calculation of Barkan's alleged damages. Dunkin' claims that Barkan's damages calculations are insufficient as a matter of law because they rely upon hypothetical information and speculation. Dunkin' notes that Barkan did not have exact store locations for several of the proposed stores and that Barkan's expert inappropriately selected December 31, 2004 as the start date for his damages calculations, not the date(s) on which any of the proposed stores were slated to be open and begin earning profits, but the "approximate date" when Barkan learned that he would not have financing from CIT or Dunkin' for the stores. (Document No. 110-2 at p. 23). Dunkin' also notes that Barkan's expert does not offer any direct opinion as to the loss in value of the SDAs. Id. at 22. Although Barkan does not claim to have an exact formula for measuring its damages, Barkan asserts that "a jury may make a reasonable estimate of damages based on relevant data." (Document No. 115 at p. 17). Barkan fails to fully flesh out any precise damages calculations, but merely states that "the very reason Barkan was awarded SDAs and was developing stores is Dunkin' vetted his business...and

concluded he would succeed." Id. at 18.  Barkan then points back to the fact that it alleges Dunkin's breach caused its damages and "[e]ven where damages cannot be measured with exactness, a jury could still return a verdict for a plaintiff." Id. at 17.  Barkan also contends that any uncertainty in the calculation of damages was the result of Dunkin's wrongful conduct and Dunkin' should not be permitted to use such wrongful conduct to its benefit under Rule 56.  This Court agrees with Plaintiffs that rejection of Plaintiffs' damages theory at this stage of the proceedings would be premature.

The issue of damages is further clouded by the death of Plaintiffs' designated damages expert, Mr. Kenneth Gartrell, last October.  Plaintiffs recently moved for leave to designate a replacement damages expert, Mr. Frank C. Torchio.  (Document No. 127).  Defendants oppose the Motion.  (Document No. 128).  Although Plaintiffs represent that Torchio "will rely on Gartrell's previously produced expert report...and will not introduce a new damages theory or valuation methodology," (Document No. 127-2 at p. 7), Defendants object on the grounds that they are "highly suspicious that Barkan may really be seeking to revise and expand its expert opinions."  (Document No. 128 at p.8).  The Court will not assume that Plaintiffs are playing games and concludes that the unique circumstance of the death of an expert presents good cause for substitution.  See Terra Venture, Inc. v. TDN Real Estate-Overland Park, L.P., 2004 WL 5509090 at *1 (D. Kan. 2004).  Thus, Plaintiffs' Motion for Leave to Designate a Substitute Damages Expert (Document No. 127) is GRANTED.  Plaintiffs shall produce an expert report by June 16, 2009 and make their substitute expert available for deposition by July 10, 2009.  If

Defendants wish to designate a new rebuttal expert, they may file a motion for leave to do so by July 31, 2009.

**Conclusion**

For the reasons stated, I recommend that Dunkin's Motion for Summary Judgment (Document No. 110) be DENIED.  In addition, as provided herein, Plaintiffs' Motion to Strike (Document No. 114) is DENIED and Plaintiffs' Motion for Leave to Designate a Substitute Damages Expert (Document No. 127) is GRANTED.

Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of the Court within ten (10) days of its receipt.  See Fed. R. Civ. P. 72(b); LR Cv 72.  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the District Court and the right to appeal the District Court's decision.  See  United States v. Valencia- Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


  /s/ Lincoln D. Almond
LINCOLN D. ALMOND
United States Magistrate Judge
May 26, 2009