UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

IRWIN J. BARKAN and
D&D BARKAN LLC,

    Plaintiffs,

v.                                    C.A. No. 05-050L

DUNKIN' DONUTS, INC. and
BASKIN-ROBBINS USA, CO.,

    Defendants.


**MEMORANDUM AND ORDER**

Ronald R. Lagueux, Senior District Judge.

    This matter is before the Court on an appeal from the Report and Recommendation ("R & R") issued by Magistrate Judge Lincoln D. Almond on May 26, 2009. In the R & R, Judge Almond denied the motion for summary judgment brought by Defendants Dunkin' Donuts, Inc., and Baskin-Robbins USA, Co. ("Defendants"), denied Plaintiffs' Motion to Strike, and granted Plaintiffs' Motion for Leave to Designate a Substitute Damages Expert.

    Defendants timely appealed the denial of their motion for summary judgment. Pursuant to Fed. R. Civ. P. 72(b)(3), this Court has undertaken a *de novo* review of Magistrate Judge Almond's R & R. The Court heard oral arguments, reviewed the record, and has determined that it will adopt the R & R in its entirety for reasons outlined below.

## Background

Plaintiffs in this case are Irwin J. Barkan, and his wholly-owned Rhode Island limited liability company, D & D Barkan LLC, (collectively, "Plaintiffs"). In 2002 and 2003, five separate legal entities, all owned by Barkan, entered into franchise agreements with Defendants to operate five existing Dunkin' Donut shops in Providence, Rhode Island. Also during this time period, Plaintiffs entered into four Store Development Agreements ("SDAs") with Defendants, which contemplated the development of additional Dunkin' Donuts shops around the state within specified time frames. In 2004, Plaintiffs opened two new stores, pursuant to the terms of two of the SDAs.

Financing for all these enterprises was provided by The CIT Group ("CIT"), a lender associated with Defendants. Defendants helped Plaintiffs arrange financing through CIT, and guaranteed the loan. In 2003, in the face of some financial distress and with the backdrop of some developing disputes with Defendants, Plaintiffs sought to restructure their loan with CIT.

On June 15, 2004, Defendants and Plaintiffs entered into a Settlement Agreement. According to the terms of the Settlement Agreement, Defendants agreed to help Plaintiffs refinance their debt with CIT,[1] and to amend the SDAs by, *inter alia*, postponing

---

[1] This portion of the Settlement Agreement reads:

> FRANCHISOR hereby agrees to work with

the dates by which Plaintiffs had to meet certain payment and store-opening obligations.  In exchange, Plaintiffs agreed to release any claims against Defendants, and to remain current on all obligations under the Settlement Agreement, as well as the franchise agreements and other related agreements.  From Plaintiffs' point of view, Defendants' promise to assist them in obtaining refinancing from CIT was the key inducement to enter into the Agreement.  Moreover, Plaintiffs believed that obtaining the refinancing was assured, based on Defendants' longstanding relationship with CIT and the fact that Defendants had previously guaranteed Plaintiffs' debt.

However, in July 2004, Defendants informed Plaintiffs that CIT would not refinance the debt.  Plaintiffs claim that they were later told by a CIT employee that the refinancing was rejected because Defendants never requested the refinancing from CIT and never provided CIT with the paperwork necessary to evaluate the application.

In an effort to resolve their resulting financial difficulties, Plaintiffs tried to sell the existing donut shops, along with the franchise agreements and related assets.  For

---

> FRANCHISEES and CIT to attempt to re-finance such existing debt. Specifically, FRANCHISOR will request that CIT issue a new note for the current balance of the financing, including interest and cure payments... FRANCHISOR makes no representation that CIT will provide such financing.

various reasons, many of which Plaintiffs blame on Defendants, no sale took place. In January 2005, Defendants notified Plaintiffs that they were in default of the Settlement Agreement, due to their failure to make over $1 million in payments. Defendants threatened to terminate the franchise agreements unless Plaintiffs caught up with their payments. In February 2005, Plaintiffs, and the related entities that owned the franchises, filed the original Complaint in this case, as well as a motion for a temporary restraining order, alleging that the Defendants' failure to make a good faith attempt to arrange refinancing would result in the collapse of Plaintiffs' business. Soon after the Complaint was filed, the Barkan corporate entities that owned the franchises filed for Chapter 11 bankruptcy protection. In January 2006, this Court granted Defendants' motion to dismiss the bankrupt corporate entities from the original Complaint. Plaintiffs filed an Amended Complaint in August 2006.

In October 2006, Defendants filed a Motion to Dismiss three counts of the Amended Complaint. As a result, this Court issued an Order dismissing Plaintiffs' Count IV, for violation of Massachusetts law G.L. c. 93A, and Count V, which claimed that Defendants tortiously interfered with the sale of Plaintiffs' donut shops. <u>Barkan v. Dunkin' Donuts, Inc.</u>, 520 F. Supp.2d 333 (D.R.I. 2007). The Court denied Defendants' Motion to dismiss Count III for breach of the Settlement Agreement's implied

covenant of good faith and fair dealing. The Court also denied Defendants' Motion to Strike Plaintiffs' Demand for a Jury Trial. Id. at 343.

In September 2008, Defendants renewed their objections to Plaintiffs' claims, moving for summary judgment on the three remaining counts of the First Amended Complaint. Defendants argued that Plaintiffs have not developed sufficient evidence to support their claims, and that their claim for damages, based on future lost profits from the unbuilt stores, is too speculative.

### The R & R

In the R & R, issued May 26, 2009, Judge Almond tracks the negotiations and other activities of the Plaintiffs, the Defendants and CIT, during three pertinent time periods: 1) leading up to the June 2004 Settlement Agreement; 2) after the execution of the Settlement Agreement and before CIT denied Plaintiffs' request for loan restructuring; and 3) the aftermath when Plaintiffs' businesses finally foundered. Barkan has explained that he decided to pursue this lawsuit after he was allegedly told by a CIT employee in December 2004 that the refinancing failed to go through because Defendants had not sent in adequate or complete paperwork on Barkan's behalf. Defendants deny the accuracy of this communication. This alleged statement, the admissibility and veracity of which would have to be established at trial, goes to the essence of the dispute between

the parties: did Defendants fulfill their contractual obligation to "work with" CIT to arrange refinancing for Plaintiffs?

While most of what transpired among the parties and CIT is indeed undisputed, the significance of those events is subject to varying interpretations.  For example, during June 2004, CIT employee Shelly Rush asked Defendants' employee Bethany Blowers about a couple of Barkan's stores that had closed, and about his general financial situation.  In response, Blowers was not forthcoming.  Defendants characterize Blowers' reaction as respectful discretion, out of loyalty to Barkan.  Plaintiffs characterize Blowers' reaction as a failure to cooperate with CIT - a failure which contributed to CIT's eventual denial of Plaintiffs' refinancing application.  Another transaction during the course of these negotiations raises similar questions: Blowers communicated to Barkan that CIT had requested an updated business plan.  Barkan, in turn, e-mailed Blowers, attaching a business plan and financial statement.  He asked Blowers to review the attachments and forward them to CIT.  It turned out that Barkan had inadvertently attached two copies of the financial statement to the e-mail and had failed to attach the business plan.  Without discovering the mistake, Blowers forwarded Barkan's e-mail to CIT.  Consequently, CIT never received Barkan's business plan.

The R & R details these events, and others that are

similarly murky. Characterizing the conflicting allegations as a "factual quagmire," Judge Almond writes, "Because these factual controversies could be reasonably resolved in favor of either party, summary judgment is not appropriate at this stage of the proceedings." R & R, p. 18. This Court concurs.

### Best Efforts

The Settlement Agreement, as with all contracts governed by Rhode Island law,[2] obligates both parties to fulfill its terms in good faith, using diligence and their best efforts. Bradford Dyeing v. J. Stog Tech GmbH, 765 A.2d 1226, 1237 (R.I. 2001). The notion of the implied 'best efforts' term is particularly significant in contracts, such as the Settlement Agreement, that "require a party merely to seek a specific result (rather than promising to achieve one)." Reyelt v. Danzell, 533 F.3d 28, 33 (1st Cir. 2008). This Court has recently held that 'best efforts' comprises "a party's diligent, reasonable, good faith effort to fulfill the obligations imposed by the contract..." Reyelt v. Danzell, 509 F. Supp. 2d 156, 165 (D.R.I. 2007). If the factual disputes between the parties are resolved in Plaintiffs' favor, Plaintiffs may be able to demonstrate that Defendants failed to use their best efforts in fulfilling the

---

[2] This Court has previously held that Rhode Island law governs this dispute, as provided by the parties in paragraph 20 of the Settlement Agreement. Barkan v. Dunkin' Donuts, Inc., 520 F. Supp. 2d 333, 340 (D.R.I. 2007).

-7-

terms of the Settlement Agreement.

### Conclusion

For these reasons, the Court adopts the Report and Recommendation of Magistrate Judge Almond in its entirety. No judgment shall enter in this case until all claims are resolved. The parties shall submit pre-trail memoranda within thirty days of the date of the entry of this Order. This matter will then be set down for jury trial at the Court's earliest convenience. It is so ordered.

/s/ Ronald R. Lagueux

Ronald R. Lagueux
Senior United States District Judge
September 15, 2009